## CIRCUIT COURT OF THE CITY OF RICHMOND

Hattie Carter

v.

Joseph Niamtu et al.

February 7, 1984

Case No. LG 251

By JUDGE MARVIN F. COLE

The first inquiry in this case is whether the Virginia Tort Claims Act is applicable to the facts in this case. The 1981 General Assembly adopted the Virginia Tort Claims Act (8.01-195.1, et seq. Code of Virginia) which waived to a limited extent the State's immunity from liability in certain tort actions. The Act by its own terms applies only to claims accruing on or after July 1, 1982. This brings into being the question of when a claim accrues. Plaintiff suffered her initial injury on May 10, 1982. She remained under the care of Dr. Niamtu through May 24, 1982, but he did not see her after May 24, 1982. She remained under continuous care of other employees of MCV until September 9, 1982, at which time she was released.

The record filed in this case shows that the plaintiff was first examined on April 26, 1982, by

someone named Thomas. The record does not disclose whether Thomas was a student or a doctor. On the same day another person gave the patient instructions concerning treatment scheduled for May 10, 1982.

On May 10, 1982, the plaintiff presented herself for an operation and the record shows that an operation under anesthesia was performed by Dr. Niamtu, whose final diagnosis was impacted third molars. If I read the record correctly, he extracted teeth numbers 16, 17 and 32.

On May 17, 1982, the plaintiff was again seen by Dr Niamtu and the record discloses a burn from the extractions. The complaints were that plaintiff was not eating, and there was swelling, infection and bleeding. The plaintiff was treated for these complaints.

On May 24, 1982, the plaintiff was again seen by Dr. Niamtu and the record discloses that the lip burn was healing, but not healed and that it was depigmented.

On June 21, 1982, the plaintiff returned to MCV and the record shows that this was for follow-up of the third molar extractions. The plaintiff was complaining of continuous pain, especially during function. Dr. Niamtu did not see the plaintiff on this occasion, but someone by the name of P. Johnson saw her. Briefs filed herein lead me to believe that this was another resident. His examination showed pain upon palpation and his diagnosis was post-op hematoma. He prescribed moist heat to the face and noted that the patient was to return in two weeks (July 9, 1982) for follow-up.

After this visit of June 21, 1982, the Virginia Tort Claims Act went into effect.

On July 9, 1982, the plaintiff was seen by another resident for follow-up of the above problem. The record reflects that the plaintiff is feeling better and healing and was advised to continue penicil-

lin. The patient was to return in one week for follow-up.

The plaintiff was seen by other residents on July 19, 1982, August 2, 1982, and on September 9, 1982, all for follow-up of the original molar problems or problem brought about by the original extractions.

Section 8.01-195.3 states that the Commonwealth shall be liable for claims for money only accruing on or after July 1, 1982, on account of damage to or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any state employee to the extent of $25,000.00. This statute further states that any recovery based on the following claims are hereby excluded from the provisions of the article:

1. Any claim based upon an act or omission which occurred prior to July 1, 1982.

Since the claim in this case against the Commonwealth of Virginia is based upon an act or omission which occurred prior to July 1, 1982, it is excluded and therefore the Virginia Tort Claims Act is not applicable to this case. It will be noted that the effective date and the claims thereunder are tied to the act or omission and are not tied to the time that the cause of action arose. Therefore, the continuous treatment rule is not applicable to this case. However, even if it were, Dr. Niamtu had not performed any treatment after May 24, 1982, and the Tort Claims Act was still not in effect.

The second inquiry in this case is whether Dr. Niamtu, a full-time resident employed by the Medical College of Virginia, is entitled to immunity in a medical malpractice case brought against him by a patient. The facts have been stipulated by the parties for the purposes of this case.

The Supreme Court in the case of Lawhorne v. Harlan, 214 Va. 405 (1973) was confronted with a plea of immunity on the part of a surgical intern,

Pulito, of the University of Virginia Hospital, and the Supreme Court in the case of James v. Jane, 221 Va. 43, was confronted with a plea of immunity by a physician who occupied twofold duties in the University of Virginia Hospital, which were to teach medical students of the Medical School and to attend patients in the hospital, usually in the presence of and assisted by students, interns, and residents in the University Hospital. I am confronted in this case with a plea of immunity on the part of a resident at the Medical College of Virginia, who falls somewhere between the intern in Lawhorne and the staff physicians in James.

In Lawhorne, on the date of the alleged negligence, Pulito was a recent medical school graduate in his first year of a five year postdoctoral training program. His position was that of a surgical intern. He was a salaried employee of the hospital He was not fully licensed to practice medicine, having completed only a part of the licensing examinations, as is the case with most interns. He could only practice at the hospital in an approved training and instruction program under the supervision of the licensed physicians of the hospital staff. Under the training program Pulito was required to provide "house services" which included a period of service on the surgical staff in the emergency room of the hospital.

Briefly stated the facts of the Lawhorne case are as follows: On March 8, 1979, Lawhorne received a severe blow on his head. On March 9 he was taken to the emergency room where he was seen, treated and released by Pulito. X-rays were taken of the head which revealed that he had sustained a fractured skull, but his mother, who accompanied him, was not so advised. Both Lawhorne and his mother were advised that there was nothing seriously wrong. On March 10, Lawhorne's condition worsened and he returned to the emergency room, where it was "discovered" that he had suffered a fracture on March 8. He subsequently died on March 24, as a "result of the delay in diagnosing and treating the fractured skull."

The Supreme Court granted immunity to Pulito, saying that he was an employee of the hospital, an organ of the Commonwealth, vested with and required to exercise discretion and judgment in connection with those persons who presented themselves as patients at the emergency room of the hospital. In performing his duties, Pulito was required in the exercise of his best judgment either to treat and release the patient or to treat and admit them to the hospital. The court said he has no right to choose his patients, and no contractual relationship was created between him and the hospital's patients.

In commenting upon the Lawhorne case, the Supreme Court in James noted that the intern exercised discretionary judgment in treating those persons who presented themselves as patients at the emergency room, had no contractual relationship with the hospital's patients, received no compensation from patients, and did not act independently as far as any patient was concerned or involved.

Some seven years later the Supreme Court decided the case of James v. Jane, 221 Va. 43 (1980). Some have said this case significantly limits the operation of sovereign immunity in Virginia and that the court had departed from traditional doctrines of governmental immunity in the case. The court at least wrote some guidelines and further defined the principles of immunity, perhaps to give aid and comfort to Justice Cochran, who has consistently dissented to the opinions of the court on immunity, stating that they create hair-splitting distinctions instead of sound, logical, and certain rules of general application.

In the James case, James sued Dr. Jane and Dr. Riddervold for damages for personal injuries resulting from allegedly negligent acts of the defendants in connection with a myelogram performed on the plaintiff. The defendants filed a plea of im- munity.

The defendants in James were both licensed to practice medicine and each was a full-time member of the faculty of the Medical School of the University of

Virginia. Dr. Jane was chairman of the Department of Neurosurgery of the Medical School and Chief of Neurosurgery of the hospital during the time of the alleged negligence. Dr Riddervold was an Associate Professor of Radiology of the Medical School and a member of the hospital staff in the Radiology Department. The basic responsibilities of faculty members of the Medical School were teach- ing, research, and patient care. All faculty members are members of the hospital staff, whose teaching responsibility includes supervision of residents, medical students, and nursing students. The defendants, as fulltime faculty members were not permitted to engage in the practice of medicine individually or outside the Medical Center, unless during a one month vacation period. The only compensation was a fixed salary. If a patient at the hospital is able to pay, he is classified as a private patient; if he is unable to pay, he is classified as a staff patient. However, the patient receives identical treatment regardless of classification. No member of the staff may refuse to see a patient because of his classification. However, the attending physicians have the privilege to select the patients they will treat and are under no obligation to accept any individual or class of persons as patients. Residents and interns in training do not enjoy this privilege. They have the duty to treat any patient who is assigned to them for treatment.

In the James decision the Supreme Court stated that to determine the question of immunity, you examine the following factors:

1. The function the employee was performing at the time.

2. The extent of the State's interest and involvement in that function.

3. Whether the act performed involves the use of judgment and discretion.

4. The degree of control and discretion exer-

cised by the State over the employee whose negligence is involved.

It might be helpful to look at the educational requirements to practice dentistry. No person can practice dentistry unless he possesses a current valid license from the Board of Dentistry to do so.

The applicant for a license from the Board must have the following qualifications:

1. Be of good moral character.
2. Eighteen years of age or over.
3. Is a graduate of and have a diploma from a professional accredited and reputable dental school, college, or dental department of a university.

The applicant must pass examinations given by the Board of such character as to test the qualifications of the applicant. And it shall be unlawful for any person to engage in the practice of dentistry or any branch thereof unless he shall have passed the examination and received a license from the Board. Va. Code Sections 54-168 through 54-179.

In James the court gave an explanation and reason why they granted immunity to the intern in Lawhorne. They said it was because of his inexperience, closely controlled, supervised and directed by his employer. Indeed the intern was prevented by law from rendering medical services except under the supervision of a licensed member of the hospital staff to whom he is responsible and accountable at all times. The state's interest and the circumstances and conditions of the intern's employment required that he be afforded immunity.

After completing his examination and after receiving his licensure to practice dentistry, the dentist may desire to continue his education and training to become a specialist in any of the various fields of specialization. This takes a minimum of three years of training and in some fields it may take as many as six or seven years of training. During the

period of postgraduate study, the person is known as a resident in the field of his specialization. Evidently, the Commonwealth does not have much interest in this type of practice because the General Assembly has passed no statutes regulating residents and there is no regulation of higher education past the licensure of applicants.

In our case the stipulated facts show that the defendant, Dr. Niamtu, was licensed to practice dentistry in Virginia; that he was employed by MCV as a senior assistant resident in his third year of a four year residency program in oral and maxillofacial surgery. His duties were to run and supervise the various assigned MCV sanctioned clinics, care for and supervise hospitalized and emergency room patients, and supervise dental students, interns and other residents. Dr. Niamtu was himself supervised on a daily basis by his teaching professors and the chief resident. All of the surgical procedures performed on the plaintiff were performed by Dr. Niamtu who operated under the supervision of Dr. Robert Campbell. Dr. Campbell was not present at the time the operations were performed and did not assist in the operations upon the plaintiff. Dr. Niamtu signed the surgical record form as the "attending physician".

The issue here is whether Dr. Niamtu functioned more like the intern in Lawhorne or the staff member in James. Let us look at the factors suggested in James as determining factors in the matter to see if under the law he is immune for acts of negligence.

1. The function the employee was performing at the time.

Clearly Niamtu was more nearly like the staff member. He signed as attending physician. He performed the operations by himself without assistance from anyone. He had no supervision at the time.

2. The extent of the State's interest and involvement in that function.

In <u>James</u> the Supreme Court stated that the paramount interest of the Commonwealth was to operate a good medical school and that it be staffed by competent administrators and professors. The court further stated in <u>James</u> that the State's interest in the treatment of a specific patient was slight and equally as slight was the control exercised by the state over the physician in the treatment accorded a specific patient. The court then stated that the interest and involvement in the treatment of a specific patient is not so great as to entitle staff physicians immunity employed by the Commonwealth. The court further commented that the only interest the State had in affording immunity to a physician practicing in State hospitals is the increase in the probability of an increase in the cost of medical malpractice insurance.

It would therefore appear that the interest of the Commonwealth in the treatment of the plaintiff was slight and insignificant.

3. Whether the act performed involves the use of judgment and discretion.

Clearly the operations upon the plaintiff involved judgment and discretion on the part of the defendant. In fact he had no supervision in the operating room and he was solely responsible for his actions. Some mention is made in the brief of the defendant that he was under the supervision of Dr. Robert Campbell. The record does not indicate the presence of Dr. Campbell and if such supervision existed, it was not being exercised at the time.

4. The degree of control and discretion exercised by the state over the employee whose negligence is involved.

Dr. Niamtu was a senior assistant resident; he was licensed to practice dentistry; he ran and supervised the various assigned sanctioned clinics; cared for and supervised hospitalized and emergency room patients; supervised dental students; supervised interns; supervised other residents.

I am of the opinion that when you consider the duties of Niamtu in this case, his experience, and his high position on the staff, and the fact that he is a fully licensed dentist, Niamtu is more like the staff physician in the James case; and therefore I find that he is not entitled to immunity under the facts of this case. This is not to say that other residents under different circumstances might not be entitled to immunity.